**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 07-cv-00205-REB-BNB

HIDIE CHASE and KENNETH CHASE, as parents and next friend of K.C., a minor,

  Plaintiffs,

v.

MESA COUNTY VALLEY SCHOOL DISTRICT NO. 51,

  Defendant.

_____

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**
_____

**Blackburn, J.**

    The matters before me are (1) **Plaintiff's** (sic) **Combined Motion and Brief in Support of Summary Judgment** [#54][1] filed September 5, 2008; and (2) defendant's **Motion for Judgment on the Administrative Record and Brief in Support** [#56], filed September 5, 2008.[2]  Having the consent of the magistrate judge, I withdraw the prior orders of reference as to these motions.  (**See Memorandum** [#55] filed September 5, 2008; **Memorandum** [#57] filed September 8, 2008.)  I grant defendant's motion and deny plaintiffs' motion.

_____

    [1]  "[#56]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

    [2]  The issues raised by and inherent to the cross motions for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motions stand submitted on the briefs. *Cf.* FED. R. CIV. P. 56(c) and **(d)**. *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

## I.  JURISDICTION

I have jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 20 U.S.C. § 1415(i)(2)(A) (Individuals with Disabilities Education Act).

## II.  STANDARD OF REVIEW

This action is brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400-1487.  The IDEA was enacted to assist state and local agencies in providing education for children with disabilities and "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d).  To that end, the IDEA requires states that receive federal assistance to create an individualized education program ("IEP") for each disabled child.  *Id.* § 1412(a)(4).  This written statement must be developed, reviewed, and revised in accordance with the IDEA.  *Id.* § 1414(d)(1)(A).  The goal of the IEP is to "provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" and, "if the child is being educated in the regular class rooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."  ***Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley***, 458 U.S. 176, 203-04, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982).[3]

---

[3]   Moreover, the IDEA requires that the child be educated in the "least restrictive environment:"

To the maximum extent appropriate, children with disabilities . . . are educated with children who are not

2

Parents who believe their child is not being provided benefits in compliance with the IDEA may file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6).  After filing a complaint, the parents are entitled to an impartial due process hearing.  *Id.* § 1415(f).  If that hearing is held before a local education agency such as a school board, "any party aggrieved" by the resulting decision may appeal to the state education agency.  *Id.* § 1415(g).  Once state administrative procedures are exhausted, "[a]ny party aggrieved by the findings and decision"  may bring a civil action in district court.  *Id.* § 1415(i)(2).  In the federal district court, administrative decisions implicating the IDEA are reviewed to determine whether the state complied with the procedures required by the IDEA and whether the IEP conforms to the requirements of the Act.  Substantively, it must be "determine[d] whether the IEP was reasonably calculated to enable [the student] to receive educational benefits."  ***Urban v. Jefferson County School District R-1***, 89 F.3d 720, 726 (10th Cir. 1996).

When reviewing a case brought under the IDEA, I must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the

---

disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C § 1412(a)(5)(A).

evidence, while giving 'due weight' to the administrative proceedings below.  This has been described as a 'modified de novo review' or as 'involved oversight.'" ***Murray by and Through Murray v. Montrose County School Dist. RE-1J***, 51 F.3d 921, 927 (10th Cir. 1995).[4]   Because the parties have not submitted additional evidence, I independently review the evidence in the administrative record in my determination of this matter.  However, my review is limited to the issues presented and decided below. ***Association for Community Living in Colorado v. Romer***, 992 F.2d 1040, 1043-44 (10th Cir. 1993) (stating that, with exceptions not argued here, judicial review is not available unless plaintiff exhausted administrative remedies).  The factual findings of the administrative official are considered prima facie correct.  ***L.B. ex rel. K.B. v. Nebo School District***, 379 F.3d 966, 974 (10th Cir.2004).  The parties agree that plaintiffs bear the burden of proof on all issues.  ***See Schaffer ex rel. Schaffer v. Weast***, 546 U.S. 49, 62, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005).

### III.  ANAYLSIS[5]

Plaintiffs are the parents and next friends of K.C., who was born on May 3, 1994. In 2000, K.C. was evaluated to determine whether he required special education services as contemplated by the IDEA.  Although K.C.'s lowest achievement score was

---

[4]  The due process hearing at issue was requested on April 21, 2005.  The Individuals with Disabilities Improvement Act of 2004 (P.L. 108-446), which reauthorized the IDEA, did not become effective until July 1, 2005.  Therefore, all citations herein are to the 1997 version of the IDEA.  In addition, the federal regulations implementing the new statute were not promulgated until 2006.  Therefore, I cite to the 1999 regulations, which remained in effect in 2005.

[5]  The operative pleading is plaintiffs' amended complaint, which was filed by counsel.  Thus, although the original complaint was filed *pro se*, the amended complaint is not entitled to the liberal reading and relaxed standard of review that is afforded *pro se* pleadings.  ***Cf. Haines v. Kerner***, 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972).

one point above the cut-off score for eligibility as a student with a perceptual or communicative disability, from the second through the fourth grades, defendant provided him with resource room instruction in reading and writing for 45 minutes a day, three times a week.[6]

When K.C. started fourth grade in the fall of 2003, and in anticipation of his upcoming triennial IEP review,[7] he underwent further cognitive and educational achievement testing. All K.C.'s test scores from this evaluation fell in the average range, and again, he did not manifest a qualifying discrepancy between ability and achievement on any measure. At the review meeting on October 30, 2003, it was again determined that even though K.C. did not strictly qualify for benefits under the IDEA, he would be continued in special education because his mother was very concerned with his reading skills. Nevertheless, because K.C.'s teacher observed that he was proficient in all his reading and writing areas, that he was performing at a much higher level than other students in the class who did not qualify for resource teaching, and that many of the objectives on his IEP had been met by the time he entered her classroom, the IEP team decided that K.C. no longer needed to be removed from the regular

---

[6] A student who has a significant discrepancy between his intellectual potential ("IQ") and his achievement in one or more specific areas, including basic reading skills and written language expression, is considered to have a perceptual or communicative disability. **Colorado Rules for the Administration of the Exceptional Children's Education Act** 2220-R-2.02(6). (Although these rules have since been amended, because all actions relevant to this case took place prior to the effective date of those amendments, I refer to the 2005 version of the rules.) Whether a significant discrepancy between IQ and achievement exists is determined using a regression-based formula, and the state Department of Education provides Colorado school districts with a reference chart containing achievement score cutoffs based on a child's IQ.

[7] Every third year, the school district updates its testing information, retests, and reevaluates special education students, and establishes new benchmarks and baselines based on the results.

classroom for special education.  Instead, he was to stay in the classroom but could go to the resource room if he needed additional support.  The next day, K.C. began staying in the classroom on a full-time basis.  His performance remained the same.

At the time of the next annual meeting on November 16, 2004, K.C. had accomplished all the goals and objectives of his 2003-2004 IEP.  Under the new IEP, K.C. was to continue full-time in the regular classroom, with only indirect support from the resource teacher.  In April, 2005, K.C.'s parents requested a due process hearing with the Colorado Department of Education to challenge the adequacy of this IEP.  The matter was dismissed with prejudice by an Impartial Hearing Officer ("IHO"), on July 11, 2005.  Plaintiffs appealed the IHO's order to the Office of Administrative Courts.

While that appeal was pending, defendant convened an IEP meeting on October 12, 2005.  At that meeting, evidence of an August, 2005, evaluation and of K.C.'s school performance were found to support a conclusion that he did not suffer from a perceptual or communicative disability and, therefore, was not qualified for benefits under the IDEA.  Nevertheless, and although K.C.'s teachers felt that he no longer needed any particular accommodation to function successfully in the classroom, they continued to implement the requirements of the 2004-2005 IEP during K.C.'s sixth-grade year.

Meanwhile, on January 25, 2006, an Administrative Law Judge ("ALJ") issued an order affirming in part the IHO's decision and remanding the case with directions to hold an evidentiary hearing on specified issues.  On remand, the matter was heard by a different IHO, who ultimately issued a decision finding in favor of defendant on all issues, except as to the adequacy of notice prior to the October 12, 2005, IEP meeting.  Plaintiffs again appealed.  On October 31, 2006, the ALJ issued a decision reversing

6

the IHO regarding the prior written notice issue and finding in favor of defendant on all issues.  This lawsuit followed

Plaintiffs assert three claims for relief under the IDEA.  I examine the issues presented by each *seriatim*.

## A.  VIOLATION OF 20 U.S.C. § 1414

Plaintiffs' first cause of action alleges that the 2004-2005 IEP failed to include certain statements mandated by the IDEA.  ***See*** 20 U.S.C. § 1414(d)(1)(A).  More particularly, plaintiffs allege that the 2004-2005 IEP failed to include compliant statements regarding:

> (1) "the child's present levels of educational performance, including . . . how the child's disability affects the child's involvement and progress in the general curriculum . . . ." ***Id.*** § 1414(d)(1)(A)(i);

> (2) measurable annual goals, including benchmarks or short-term objectives, which are related to meeting the educational needs resulting from the disability and the needs that will enable the child to be involved and progress in the general curriculum, 34 C.F.R. § 300.347(2); 20 U.S.C. § 1414(d)(1)(A)(ii), and a statement of "how the child's progress toward meeting the annual goals . . . will be measured . . . ."  20 U.S.C. §1414(d)(1)(A)(viii)(I);

> (3) "the special education and related services and supplementary aids to be provided to the child, or on behalf of the child . . . ."  20 U.S.C. § 1414(d)(1)(A)(iii); and

> (4)  "program modifications or supports for school personnel that will be provided for the child . . .  to advance appropriately toward attaining the annual goals" and to be involved and progress in the general curriculum, as well as "any individual modifications in the administration of State or districtwide assessments that are needed in order for the child to participate in such assessment . . . ." ***Id.*** § 1414(d)(1)(A)(i)(v)(I).

In addition, plaintiffs allege that defendant violated section 1414 by failing to provide them with "adequate prior written notice" of the hearing and by failing to allow them "to participate as meaningful members of [K.C.'s] IEP Team." *See id*. § 1414(d)(1)(B).  I analyze the issues presented by these various requirements separately.

### 1.  Present levels of performance, measurable annual goals, and how progress will be measured

The IDEA provides that an IEP shall include "a statement of the child's present levels of educational performance, including . . . how the child's disability affects the child's involvement and progress in the general curriculum."  20 U.S.C. § 1414(d)(1)(A)(i).  In general, the content of this statement is committed to the discretion of the participants in the IEP meeting.  *O'Toole v. Olathe District Schools Unified School District No. 233*, 144 F.3d 692, 702 (10th Cir. 1998).[8]  Nevertheless, the regulations suggest that the IEP should "accurately describe the effect of the child's disability on the child's performance in any area of education that is affected," and avoid simple labels like 'mental retardation' or 'deafness.'" *Id.* (citation omitted and internal quotation marks omitted).  Moreover, although "test scores are appropriately included, [] they should be self-explanatory or accompanied by an explanation." *Id.* (citation and internal quotation marks omitted).

The IEP must include also a statement of measurable annual goals and

---

[8]  In *O'Toole*, the Tenth Circuit considered a prior version of the regulations and looked to the appendix for guidance regarding the required content of an IEP.  *See O'Toole*, 144 F.3d at 702-03. Although the appendix to the 1999 version of the regulations, which are applicable here, does not address the content of the IEP with regard to levels of performance and the setting and measuring of goals, because the 1999 regulations themselves are substantially similar to the version considered in *O'Toole* with regard to these issues, I find it appropriate to consult *O'Toole*, and by the extension, the appendix, for guidance.

objectives to provide "a way for the child's teacher(s) and parents to be able to track the child's progress in special education." *Id.* at 702-703.  Benchmarks or short-term objectives related to meeting the child's needs resulting from the disability must be included, 34 C.F.R. § 300.347(2); 20 U.S.C. § 1414(d)(1)(A)(ii), as well as a statement of "how the child's progress toward meeting the annual goals . . . will be measured," 20 U.S.C. §1414(d)(1)(A)(viii)(I).  However, "there is no legal authority requiring a particular level of specificity in the statement of annual goals." *O'Toole*, 144 F.3d at 706.

My review of the record shows that the 2004-2005 IEP met the procedural requirements of the IDEA with respect to the required statements of K.C.'s present levels of performance, measurable annual goals, and how progress toward the annual goals would be measured.  The 2004-2005 IEP contained a statement of K.C.'s present levels of performance in several areas.  The "Educational" section stated that the "[f]ormal testing on the Woodcock-Johnson III and work in the regular classroom shows that his strength is in the academic area of Mathematics" and that "[r]eading is still the weakest of the content areas as indicated from the formal testing on the Woodcock-Johnson III (10/28/03) and in the regular classroom."  This page referred to the "attached testing results for NWEA and CSAP."  Although these are raw test scores, they were accompanied by an explanation of whether K.C.'s performance as demonstrated by those scores was unsatisfactory, partially proficient, or proficient. K.C.'s Woodcock-Johnson III scores were accompanied also by an explanation, including a summary comparing K.C.'s scores to those of other students at his grade level.  In short, the IEP provided a comprehensive statement of K.C.'s performance

within the general curriculum.

The IEP included also appropriate statements of annual goals and how progress toward those goals was to be measured.  At the time of the annual IEP meeting on November 16, 2004, K.C. had accomplished all the goals and objectives of his previous IEP.  The 2004-2005 IEP stated as an annual goal that K.C. "will continue to show improvement in the areas of Reading and Written Language."  The stated objective was that K.C. would "demonstate (sic) that he is able to successfully meet classroom expectations in all academic areas and maintain a C average or better with indirect supportive assistance from the Resource Teacher."  The criteria for evaluation were frequent consults with the classroom teacher, parent, and student.  The IEP described K.C.'s "Baseline" as "[t]he student is maintaining average grades in the classroom." *See Rowley*, 102 S.Ct. at 3049 ("When the 'mainstreaming' preference of the [IDEA] has been met and a child is being educated in the regular classrooms of a public school system, the system itself monitors the educational progress of the child. . . . Children who graduate from our public school systems are considered by our society to have been 'educated' at least to the grade level they have completed, and access to an 'education' for handicapped children is precisely what Congress sought to provide in the [IDEA].").

Moreover, the 2004-2005 goal encompassed supervision by the teaching staff of K.C.'s short- and long-term academic performance.  The IEP expressed a long-term goal of achieving a C average or better and a short-term goal of maintaining this grade average throughout the entire year, with the assistance of the resource teacher and frequent consultations between the teachers, the parents, and the student.  That this

goal was being implemented in the classroom was affirmed at the hearing.[9]  Thus, the 2004-2005 IEP embraced many tools for frequent and regular measurement of K.C.'s progress toward meeting his goals.

Plaintiffs' arguments to the contrary are not supported by the record.  Although plaintiffs introduced several pages of proposed goals and objectives for inclusion in the IEP at the first administrative hearing, they admitted that these were merely examples "to generate a discussion about what specific goals and objectives might be put into the IEP."  The record does not contain any evidence to show that these proposed goals and objectives were educationally sound or appropriate, and, in fact, the Executive Director of Student Services for the school district testified that they were not.  The preponderance of the evidence shows that the 2004-2005 IEP's statements of goals, objectives, and measurements of K.C.'s progress complied with the procedural requirements of the IDEA.

Moreover, the record establishes that K.C. made substantial progress in overcoming his disability and required less intervention to assure his success in the general curriculum.  The 2004-2005 IEP reflected this progress with its overall goal that K.C. would show improvement in reading and written language and its objective that he would demonstrate improvement by meeting classroom expectations in all academic

---

[9]  K.C.'s resource teacher testified that because K.C. was in the regular classroom on a full-time basis, he would be expected to meet the same standards and expectations as all the other students in the classroom, and the criteria for meeting this goal would be frequent consultation with the classroom teacher.  K.C.'s fifth grade teacher affirmed that she consulted with the resource teacher about K.C.'s progress at least once per week and discussed "where he was at, how he was doing his work, if he was keeping up, if he was maintaining what needed to be doing grade-wise."  According to the resource teacher, because K.C.'s progress was measured also through his everyday class activities, tasks, and tests, which would indicate whether he was keeping up with his peers, multiple objectives were no longer applicable.

areas and by maintaining a C average or better with indirect support from the resource teacher. K.C. met fifth grade classroom expectations in all academic areas, and although he scored lower in reading and writing, he was still maintaining average grades. He did not fall behind his non-disabled peers.

In short, the preponderance of the evidence shows that K.C.'s 2004-2005 IEP included IDEA-compliant statements regarding his performance, goals, and progress, that it was reasonably calculated to confer educational benefits on him, and that he achieved his IEP goal in the 2004-2005 school year. For these reasons, defendant is entitled to summary judgment on this aspect of plaintiffs' claim.

## 2. Special education and related services and supplementary aids

The IDEA requires that an IEP contain "a statement of the special education and related services and supplementary aids to be provided to the child, or on behalf of the child." 20 U.S.C. § 1414(d)(1)(A)(iii). K.C.'s 2004-2005 IEP contemplated that he "will be maintained in Secial (sic) Ed. but on an indirect service basis where he will be expected to meet academic and social expectations in the regular classroom." He was assigned thirty minutes per week of consultation with a resource teacher.

The record contains no evidence suggesting that K.C. needed any supplementary aids and services beyond those provided by the IEP. Indeed, during fifth grade, K.C. did not require any direct assistance from a resource teacher or any other special education staff. The preponderance of the evidence shows that the IEP was adequate with respect to its statements regarding supplementary aids and services. Defendant's motion for summary judgment on this issue thus should be granted, and plaintiffs' motion denied.

### 3.  Accommodations and modifications

The IDEA requires that an IEP contain "a statement of the program modifications or supports for school personnel that will be provided for the child . . .  to advance appropriately toward attaining the annual goals" and to be involved and progress in the general curriculum.  In addition, the IEP must contain "a statement of any individual modifications in the administration of State or districtwide assessments that are needed in order for the child to participate in such assessment."  20 U.S.C. § 1414(d)(1)(A)(i)(v)(I).  The preponderance of the evidence shows that the 2004-2005 IEP was not deficient in this respect.

The 2004-2005 IEP stated that, in order to participate in all activities related to the general curriculum, K.C. required the following accommodations and modifications: "[c]heck for understanding of all directions given orally; shorten and allow more time for written assignments; modify spelling assignments."  In addition, when completing standardized testing, K.C. was to be allowed to take the test in a different location, such as the resource room, and he was to be allowed extra time to complete the testing. Further, on standardized tests in math and language arts, he was permitted to have directions read to him.

Not only did the IEP include the required statements, the evidence shows that they were effective.  K.C.'s fifth grade teacher testified that she implemented these accommodations even though she did not feel they were necessary for K.C.'s success, and that K.C. was able to function successfully in the regular classroom with these modifications.  Accordingly, defendants are entitled to summary judgment on this aspect of plaintiffs' claim as well.

### 4.  Parental participation

Plaintiffs allege also that defendant failed to provide proper written notice or allow

them to meaningfully participate in the development of K.C.'s IEP.  ***See*** 20 U.S.C. §

1414(c)(1)(B).  Although the amended complaint is not explicit in this regard, the

general allegations suggest that plaintiffs claim they were denied opportunities to

meaningfully participate the meetings held on November 16, 2004, and October 12,

2005.  However, plaintiffs did not exhaust these claims at the administrative level.[10]

Therefore, they are not properly before me.  ***See Association for Community Living***

***in Colorado***, 992 F.2d at 1043-44.

### B.  20 U.S.C. § 1412

Plaintiffs allege next that defendant violated 20 U.S.C. § 1412 insofar as its

"procedural and substantive violations of the IDEA resulted in a denial of a free

appropriate public education in the least restrictive environment for [K.C.]."  Because the

record does not support a conclusion that defendant violated the IDEA procedurally or

substantively with respect to K.C.'s 2004-2005 IEP, as discussed above in section III.A.,

this claim fails as well.

### C.  20 U.S.C. § 1415

Finally, plaintiffs allege that defendant violated 20 U.S.C. § 1415, which requires

defendant to establish and maintain various procedures "to ensure that children with

disabilities and their parents are guaranteed procedural safeguards with respect to the

provision of a free appropriate public education by such agencies."  20 U.S.C. §

---

[10]  Plaintiffs' assertion that defendant convened an IEP Meeting on October 12, 2005, without
providing them with proper notice is addressed in section III.C.2., *infra*.

1415(a).  Among the procedural safeguards that must be provided are prior written

notice to the parents of the child whenever the school district "(A) proposes to initiate or

change; or (B) refuses to initiate or change, the identification, evaluation, or educational

placement of the child, or the provision of a free appropriate public education to the

child."  *Id.* § 1415(b)(3).[11]   Plaintiffs allege that defendant violated this section by failing

to provide the required notice prior to convening an IEP meeting at which it unilaterally

changed K.C.'s identification, thereby eliminating his entitlement to benefits under the

IDEA.  Plaintiffs contend that K.C.'s educational placement should have been

maintained in conformance with his then-current IEP until the due process hearing could

be held.  *See id.* § 1415(j).

---

[11]  Moreover, the notice must include the following:

> (A) a description of the action proposed or refused by the agency;

> (B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

> (C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

> (D) sources for parents to contact to obtain assistance in understanding the provisions of this subchapter;

> (E) a description of other options considered by the IEP Team and the reason why those options were rejected; and

> (F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1).

Before addressing these issues directly, I must determine first whether defendant properly concluded that K.C. was no longer entitled to benefits under the IDEA as found in his 2004-2005 IEP.  In order to be entitled to the free appropriate public education contemplated by the IDEA, a child must have a disability.  A "child with a disability" includes a child with a specific learning disability "who, by reason thereof, needs special education and related services." *Id.* § 1401(3).  As noted previously, neither K.C.'s his initial evaluation in 2000 nor the evaluation done prior to his triennial review in 2003 demonstrated a significant discrepancy between his IQ and his achievement in any area.  Thus, although K.C. was provided special education benefits in the past, he never strictly qualified for such benefits.

In August, 2005, at plaintiffs' request, K.C. underwent an updated cognitive and educational achievement evaluation, which showed a full scale IQ of 102.  In order to qualify as a student with a perceptual or communicative disability, K.C. would had to have scored no more than an 81 on any achievement measure.[12]  His lowest score on the evaluation, however, was 90.  Thus, the test did not demonstrate a significant discrepancy between K.C.'s estimated intellectual potential and his actual level of performance as required by ECEA Rule 2220-R-2.02(6).  Moreover, his teachers believed that he no longer required special accommodations, and his performance in the classroom confirmed their confidence in his abilities.

After the 2005 evaluation was completed, defendant issued a Notice of Meeting

---

[12]  Plaintiffs argue that this formula was no longer in effect at the time of the due process hearing, but produced no evidence to support that argument.  To the contrary, the evidence adduced at the hearing showed that this formula, in fact, was in effect at that time.

to plaintiffs.  The meeting was described therein as a review "to discuss the evaluations that have been completed; determine whether there continues to be a need for special education services, and if the need exists, how those services can be provided; and to develop a new IEP."  The meeting was held on October 12, 2005.  Based on K.C.'s most recent evaluation and his school performance, the IEP team determined that K.C. was no longer eligible for special education as a student with a disability.

Nothing in the record contradicts defendant's conclusion in this regard.  In fact, an independent evaluation conducted by a licensed school psychologist in March, 2006, which was performed at plaintiffs' request, supports defendant's determination that K.C. had no significant discrepancy between his ability and his achievement and showed that K.C. was able to receive benefits from regular education without additional supports. Therefore, I find and conclude that defendant's decision to discontinue K.C.'s special education services comported with the IDEA.  Thus, I turn to the precise issues raised by plaintiffs' claim under section 1415.

### 1.  Failure to maintain then-current IEP

Plaintiffs maintain that defendant violated the IDEA when it failed to maintain K.C.'s then-current IEP placement pending the due process hearing.  Section 1415(j) of the IDEA requires that, unless otherwise agreed, a child "shall remain in the then-current educational placement" during the pendency of a due process hearing.  20 U.S.C. § 1415(e)(3)(A).  *See Erickson v. Albuquerque Public Schools*, 199 F.3d 1116, 1121 (10th Cir. 1999) (referring to this as the "stay-put" provision).  Although the IDEA does not define "current educational placement," courts generally interpret that phrase to refer to the placement set forth in the child's last-implemented IEP.  *See, e.g.*,

*L.M. v. Capistrano Unified School District*, 556 F.3d 900, 902-03 (9th Cir. 2009);

*Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 625 (6th Cir. 1990); *Drinker*

*v. Colonial School District*, 78 F.3d 859, 867 (3rd Cir. 1996).  Since plaintiffs requested

a due process hearing in April, 2005, the operative IEP subject to the stay-put request

was the 2004-2005 IEP.

The evidence clearly supports the conclusion that defendant maintained K.C.'s

then-current educational placement while the due process hearing was pending, with

revisions effected in May, 2005, during K.C.'s sixth-grade year.[13]  The resource teacher,

as well as K.C.'s classroom teachers, testified that they continued to implement the

2004-2005 IEP, although they believed he was functioning at a level where they did not

feel he needed those accommodations.  Thus, defendant did not violate the stay-put

provision.

## 2.  Failure to provide proper notice

Plaintiffs claim also that defendant failed to provide the detailed prior written

notice required by 20 U.S.C. §§1415(b)(3) & (c)(1) before changing K.C.'s identification

as a child with a disability and, thereby, eliminating his entitlement to benefits under the

IDEA.  Following the first administrative hearing, the IHO found that defendant had not

complied with section 1415(c), but concluded that the error was ultimately harmless

because plaintiff remained in his prior educational placement and was afforded a full

due process hearing prior to the withdrawal of services.  The ALJ disagreed with this

---

[13]  In April, 2005, plaintiffs requested an IEP review meeting.  The meeting was held on May 6, 2005, and an addendum to the 2004-2005 IEP reflecting the special education services as they would be provided to K.C. in middle school, was added.  Plaintiffs agreed to the contents of the addendum.  *See Erickson*, 199 F.3d at 1121 ("The stay-put provision does not apply when the parent and the school district agree to changes in the services previously delivered.").

aspect of the IHO's findings.  Instead, the ALJ determined that defendant had not proposed to initiate or change any matters, but rather merely acceded to plaintiffs' request for a reevaluation, and that the October 12, 2005, meeting had been scheduled to discuss the results of that evaluation.  The ALJ, therefore, concluded that proper notice of the meeting was provided in accordance with the relevant statutory and regulatory requirements.

The record supports the ALJ's decision on this issue.  As noted previously, plaintiffs requested that K.C. receive an updated cognitive and educational achievement evaluation in August, 2005, and defendant granted that request.  *See* 20 U.S.C. § 1414(a)(2) (requiring reevaluation of a child with a disability at parents request and in any event at least once every three years).  Applicable regulations require that "[t]he results of any reevaluations are addressed by the child's IEP team under §§ 300.340-300.349 in reviewing and, as appropriate, revising the child's IEP."  34 C.F.R. § 300.321.  Pursuant to these regulations, defendant was required to "take steps to ensure that one or both of the parents . . . are present at each IEP meeting or are afforded the opportunity to participate including notifying parents of the meeting early enough to ensure that they will have an opportunity to attend and scheduling the meeting at a mutually agreed on time and place."  *Id.* § 300.345(a).  The notice must "[i]ndicate the purpose, time, and location of the meeting and who will be in attendance" and it must "[i]nform the parents of the provisions in § 300.344(a)(6) and (c) (relating to the participation of other individuals on the IEP team who have knowledge or special expertise about the child)."  *Id.* § 300.345(b).

On September 23, 2005, defendant issued a Notice of Meeting to plaintiffs.  It

scheduled a meeting for October 12, 2005, at 8:30 a.m., to be held at K.C.'s middle

school, and stated that the purpose of the meeting was "to discuss the evaluations that

have been completed; determine whether there continues to be a need for special

education services, and if the need exists, how those services can be provided; and to

develop a new IEP."  It included further a list of the individuals who would attend the

meeting.  Plaintiffs received this notice shortly after September 23, 2005, and the

meeting was held as scheduled on October 12, 2005.  Nothing in the record suggests

that the notice was untimely or that the meeting was inconveniently scheduled as to

time or place.  Indeed, K.C.'s mother attended the meeting.  The results of K.C.'s

assessments and reevaluations were discussed and, based on the most recent

evaluations and K.C.'s school performance, the IEP team determined that he was no

longer eligible for special education benefits under the IDEA. That determination was

made at, not prior to, the meeting.

The record establishes that the meeting was not scheduled for the purpose of

changing K.C.'s identification or educational placement, but instead to discuss the

results of his reevaluation.  Notice of the meeting was timely, indicated the purpose,

time, and location of the meeting, none of which were objectionable, and plaintiffs were

informed of the identities of those who would be in attendance.  I find that the notice

fully complied with both the IDEA and applicable regulations.

**THEREFORE, IT IS ORDERED** as follows:

1. That **Plaintiff's [sic] Combined Motion and Brief in Support of Summary

Judgment** [#54], filed September 5, 2008, is **DENIED**;

2. That defendant's **Motion for Judgment on the Administrative Record and**

**Brief in Support** [#56], filed September 5, 2008, is **GRANTED**;

    3.   That plaintiffs' claims against defendant are **DISMISSED WITH PREJUDICE**;

    4.   That judgment **SHALL ENTER** on behalf of defendant, Mesa County Valley School District No. 51, against plaintiffs, Hidie Chase and Kenneth Chase, as parents and next friend of K.C., a minor, as to all claims for relief and causes of action asserted in this action; and

    5.   That defendant is **AWARDED**  its costs, to be taxed by the Clerk of the Court pursuant to Fed.R.Civ.P. 54(d)(1) and D.C.COLO.LCivR 54.1.

    Dated September 17, 2009, at Denver, Colorado.

                                          **BY THE COURT:**

                                          Robert E. Blackburn
                                          United States District Judge